Elouise Pepion COBELL,
et al., Appellees,

v.

Gale A. NORTON, Secretary of the
Interior, et al., Appellants.

Nos. 00–5081, 00–5084.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 2000.

Decided Feb. 23, 2001.

David C. Shilton, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were Lois J. Schiffer, Assistant Attorney General, John A. Bryson, and Charles W. Findlay, Attorneys.

Thaddeus Holt argued the case for appellees. With him on the brief were Elliott H. Levitas, Dennis Gingold, Keith Harper and Lorna K. Babby.

Before: WILLIAMS, SENTELLE and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

This case involves a class action suit by beneficiaries of Individual Indian Money ("IIM") trust accounts against Interior Secretary Gale A. Norton and other federal officials who serve, in their official capacities, as trustee-delegates on behalf of the federal government. IIM trust beneficiaries filed suit alleging breach of fiduciary duties. Specifically, plaintiffs sought a declaratory judgment delineating appellants' trust obligations to IIM trust beneficiaries and injunctive relief to ensure that such trust obligations are carried out. After a lengthy trial, the district court concluded that the federal government and its officers have been derelict in their duties, and issued a remand to the Interior and Treasury Departments so that appellants could discharge their fiduciary obligations. The district court further retained jurisdiction and ordered appellants to file quarterly reports detailing steps taken in fulfillment of their duties. Although the decision did not resolve every issue raised by plaintiffs, the district court certified the order for interlocutory appeal.

Appellants challenge the district court's delineation of their trust obligations and assert that the district court exceeded its authority in ordering equitable relief for plaintiffs. We find that the district court had before it ample evidence to support its finding of ongoing material breaches of appellants' fiduciary obligations. Notwithstanding the fact that appellants have taken significant steps towards the discharge of the federal government's fiduciary obligations, appellants clearly have yet to fulfill their trust duties. The relief ordered was well within the district court's equitable powers. While we order the district court to modify the characterization of

some of its findings, we generally affirm its judgment and order.

## I. Background

■ The federal government has substantial trust responsibilities toward Native Americans. This is undeniable. Such duties are grounded in the very nature of the government-Indian relationship. "[A] fiduciary relationship necessarily arises when the Government assumes ... elaborate control over forests and property belonging to Indians." *United States v. Mitchell ("Mitchell II")*, 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). It is equally clear that the federal government has failed time and again to discharge its fiduciary duties. Here, there is no dispute that appellants, as trustee-delegates of the federal government, have failed to discharge fully their fiduciary obligations. The issue we confront is whether the district court properly delineated the contours of the obligations owed by the Interior Secretary, Treasury Secretary and other officials, and whether such officials have been so derelict in their obligations to justify the relief ordered by the district court.

### A. The Government–Indian Trust Relationship

The federal government-Indian trust relationship dates back over a century. The trusts at issue here were created over one hundred years ago through an act of Congress, and have been mismanaged nearly as long. To appreciate truly the nature and extent of the government's responsibilities, and appellants' failure to discharge them, it is necessary to review the history of the government-Indian trust relationship.

Since the founding of this nation, the United States' relationship with the Indian tribes has been contentious and tragic. America's expansionist impulse in its formative years led to the removal and relocation of many tribes, often by treaty but also by force. *See, e.g., Cherokee Nation*

*v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831). Official policy sought to encourage westward migration of Indian tribes by offering to exchange unsettled lands in the West for Indian land in the East. *See, e.g.,* The Indian Removal Act of 1830, ch. CXLVIII, 4 Stat. 411. Unofficial policy encouraged the forcible dislocation of Indian tribes.

In the second half of the nineteenth century, the policy of relocation was replaced with one of assimilation. At that time the federal government began to divide Indian lands into individual parcels, taking lands that had been set aside for Indian tribes and allotting them to individual tribe members. *See* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 98 (1982 ed.). "The objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force assimilation of Indians into the society at large." *Yakima v. Yakima Indian Nation,* 502 U.S. 251, 254, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992); *see also Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439, 1441 (D.C.Cir.1988) ("Allotment was justified as a means of accomplishing the then current policy of assimilation."). Once tribal lands were allotted in fee to individual Indians, white settlers could purchase the lands for settlement. Allottees, by divorcing themselves from the tribal estate, also became subject to federal and state jurisdiction on the same terms as other citizens.

This assimilationist policy began with individually negotiated treaties and was eventually enacted into federal law with passage of the General Allotment Act of 1887, also known as the "Dawes Act," ch. 119, 24 Stat. 388 (as amended at 25 U.S.C. § 331 *et seq.*). Under the General Allotment Act, beneficial title of the allotted lands vested in the United States as trustee for individual Indians. The trust was to last for 25 years or more, at which point a fee patent would issue to the individual Indian allottee. During the trust period, individual accounts were to be set up for each Indian with a stake in the allotted lands, and the lands would be managed for the benefit of the individual allottees. Indians could not sell, lease, or otherwise burden their allotted lands without government approval. Where tribes resisted allotment, it could be imposed. *See* Act of June 28, 1898, ch. 517, 30 Stat. 495 ("Curtis Act"). While the Dawes Act may not have achieved assimilation, it did result in the widespread transfer of land from Indians to white settlers. As the district court found, from 1887 to 1934, an estimated 90 million acres, accounting for approximately two-thirds of all Indian lands, left Indian ownership. *Cobell v. Babbitt,* 91 F.Supp.2d 1, 8 (D.D.C.1999) ("*Cobell V*").

Allotment of tribal lands ceased with enactment of the Indian Reorganization Act of 1934 ("IRA"), 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 *et seq.*). Lands already allotted remained so, but the IRA provided that unallotted surplus Indian lands would be returned to tribal ownership. 25 U.S.C. § 463. Rather than undo the assimilationist allotment polices, the 1934 Act extended the trust period for allotted lands indefinitely. *Id.* § 462. The federal government retained control of lands already allotted but not yet fee-patented, and thereby retained its fiduciary obligations to administer the trust lands and funds arising therefrom for the benefit of individual Indian beneficiaries. These lands form the basis for the Individual Indian Money ("IIM") accounts that are at the heart of this case.

After passage of the IRA, federal Indian policy changed yet again. In the 1950s, Congress adopted a "termination policy," whereby it sought to release Indian tribes from federal supervision and terminate the government-Indian relationship. As Assistant Interior Secretary Gover testified at trial, the policy was "specifically" aimed at "severing . . . the trust relationship." *Cobell V,* 91 F.Supp.2d at 8. In some cases, the U.S. withdrew recognition of Indian tribes altogether. *Id.* at 9.

The termination policy was no more successful than earlier assimilation efforts, and was soon replaced with the current policy of "self-determination and self-governance." *Id.* at 9. In 1975 Congress enacted the Indian Self–Determination and Education Assistance Act, Pub.L. No. 93–638, 88 Stat. 2203 (1975), which, among other things, authorizes tribes to assume some of the management functions currently imposed on the Bureau of Indian Affairs ("BIA") and Office of Trust Fund Management. In particular, a tribe may contract with BIA to manage trust accounts, including IIM accounts, for the tribe or its members. Such contracts must be approved unless BIA determines that the tribe lacks the accounting or management capabilities to fulfill the contract. *See Cobell V,* 91 F.Supp.2d at 9. Where such capacity is lacking, BIA is to assist tribes in developing the necessary capabilities to manage IIM accounts themselves. *See id.* In sum, because of BIA's own fiduciary obligations to IIM trust beneficiaries, it must ensure that a tribe can fulfill the fiduciary obligations attendant to trust management before transferring control.

### B. Federal IIM Trust Responsibilities

■ Because the United States holds IIM lands in trust for individual Indian beneficiaries, it assumes the fiduciary obligations of a trustee. " '[W]here the Federal. Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.' " *United States v. Mitchell* (*"Mitchell II"*), 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (quoting *Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 183, 624 F.2d 981 (1980)). As a result of allotment, individual Indians became beneficiaries of the trust lands, but lost the right to sell, lease, or burden the property without the federal government's approval. The federal government also probates estates related to Indian trust lands and receives and distributes income from the lease of allotted lands. Income generated from the trust lands is to be paid to the individual beneficiaries.

Under current law, the Secretary of the Interior and the Secretary of the Treasury are the designated trustee-delegates for the IIM trust. Each Secretary, or his designates, has specific fiduciary responsibilities that must be fulfilled lest the United States breach its fiduciary obligations. Several governmental agencies have specific trust obligations. These include, among others, BIA, Office of Trust Funds Management ("OTFM"), and Office of the Special Trustee ("OST"). (Their responsibilities are extensively detailed in the decision below. *See Cobell V,* 91 F.Supp.2d at 9–12.)

BIA is responsible for trust land management, including the approval of leases and land transfers, and income collection. *See id.* at 9. As noted above, BIA is also required to contract with qualifying tribes for the management of IIM accounts. OTFM, with the assistance of the Treasury Department, deposits IIM land revenues, maintains the individual IIM accounts, and ensures that money is distributed to IIM account holders or special deposit accounts where money cannot be distributed to the individual account holder. OST, created in 1994 by the Indian Trust Fund Management Reform Act, oversees IIM trust reform efforts. 25 U.S.C. §§ 4042–43.

While the Interior Department is responsible for executing most of the federal government's trust duties, the Treasury Department has substantial trust responsibilities as well. In particular, Treasury holds and invests IIM funds at the Interior Department's direction and provides accounting and financial management services. *See Cobell V,* 91 F.Supp.2d at 11.

The Treasury Department maintains only a single "IIM account" for all IIM funds, rather than individuated accounts for each individual IIM beneficiary, leaving the maintenance of individualized accounting records to OTFM. OTFM relies upon the Treasury Department's accounting records to reconcile its own IIM records. Of note, when OTFM issues a check to an IIM trust beneficiary, the amount is deducted from the relevant fund, even though the money remains in the Treasury's general account. Thus, the IIM beneficiary loses any interest that would be accrued between issuance and cashing of the check. The district court found that while "this time lapse may be short in the private sector, it can be much longer in the IIM trust context because OTFM often has incorrect addresses for the recipients." *Id.* at 12.

The federal government does not know the precise number of IIM trust accounts that it is to administer and protect. At present, the Interior Department's system contains over 300,000 accounts covering an estimated 11 million acres, but the Department is unsure whether this is the proper number of accounts. *See id.* at 10.[1] Plaintiffs claim that the actual number of accounts is far higher, exceeding 500,000 trust accounts. *See id.*

Not only does the Interior Department not know the proper number of accounts, it does not know the proper balances for each IIM account, nor does Interior have sufficient records to determine the value of IIM accounts. As the district court found, "[a]lthough the United States freely gives out 'balances' to plaintiffs, it admits that currently these balances cannot be supported by adequate transactional documentation." *Id.* Current account reconciliation procedures are insufficient to ensure that existing account records, reported account balances, or payments to IIM beneficiaries are accurate. As the Interior Secretary testified at trial, the Department is presently unable to render an accounting

for a majority of the IIM trust beneficiaries. Trial Transcript at 3762. As a result, the government regularly issues payments to trust beneficiaries "in erroneous amounts—from unreconciled accounts—some of which are known to have incorrect balances." *Cobell V*, 91 F.Supp.2d at 6. Thus, the district court concluded, and the government does not deny, that "[i]t is entirely possible that tens of thousands of IIM trust beneficiaries should be receiving different amounts of money—their own money—than they do today. Perhaps not. But no one can say...." *Id.*

C. The Indian Trust Fund Management Reform Act ("1994 Act")

Concern over federal mismanagement of the IIM trust funds is not new. The General Accounting Office, Interior Department Inspector General, and Office of Management and Budget, among others, have all condemned the mismanagement of the IIM trust accounts over the past twenty years. *See, e.g.,* U.S. GENERAL ACCOUNTING OFFICE, FINANCIAL MANAGEMENT: BIA'S MANAGEMENT OF THE INDIAN TRUST FUNDS, GAO/T–AIMD–93–4 (1993); U.S. GENERAL ACCOUNTING OFFICE, FINANCIAL MANAGEMENT: STATUS OF BIA'S EFFORTS TO RECONCILE INDIAN TRUST FUND ACCOUNTS AND IMPLEMENT MANAGEMENT IMPROVEMENTS, GAO/T–AIMD–94–99 (1994); MISPLACED TRUST: THE BUREAU OF INDIAN AFFAIRS' MISMANAGEMENT OF THE INDIAN TRUST FUND, H.R.REP. No. 102–499, at 2–3 (1992) (citing critiques of IIM trust management by Interior Department IG, OMB, and others). Time and again Interior Department officials pledged to address these concerns. Yet, as Interior officials readily acknowledge, there has been little progress at reforming the management of IIM trust accounts. *See Cobell V*, 91 F.Supp.2d at 32–33 (citing Interior Department's factual stipulations); Trial Transcript at 3768 (testimony of Interior Secretary Bruce Babbitt acknowledging that "[t]he fiduciary ob-

---

1. Note that these figures are in addition to land and accounts held in trust for tribes.

ligation of the United States government is not being fulfilled").

Beginning in 1988, Congress held oversight hearings on Interior's management of the Indian trust accounts. These hearings led to a report, MISPLACED TRUST: THE BUREAU OF INDIAN AFFAIRS' MISMANAGEMENT OF THE INDIAN TRUST FUND, H.R.REP. No. 102–499 (1992) [hereinafter "MISPLACED TRUST"], which harshly criticized the Interior Department's mishandling of the trust accounts. Consistent with prior analyses, the report found, "significant, habitual problems in BIA's ability to fully and accurately account for trust fund moneys, to properly discharge its fiduciary responsibilities, and to prudently manage the trust funds." *Id.* at 2. Interior's persistent failure to meet its obligations led the congressional investigators to conclude that top officials "have utterly failed to grasp the human impact of its financial management of the Indian trust fund." *Id.* at 5. To address these concerns, Interior commissioned an independent study which determined that reconciling the IIM trust accounts could cost over $200 million. *See Cobell V,* 91 F.Supp.2d at 13. Yet "[e]ven that expenditure would have yielded only a 'reconciliation' of approximately eighty-five percent reliability." *Id.* Once again the Interior Department pledged reforms; once again there was little improvement.

In 1994, Congress enacted the Indian Trust Fund Management Reform Act ("1994 Act"), Pub.L. No. 103–412 (1994). This law recognized the federal government's preexisting trust responsibilities.[2] It further identified *some* of the Interior Secretary's duties to ensure "proper discharge of the trust responsibilities of the United States." 25 U.S.C. § 162a(d). These "include (but are not limited to) the following":

♦ "Providing adequate systems for accounting for and reporting trust fund balances";

♦ "Providing adequate controls over receipts and disbursements";

♦ "Providing periodic, timely reconciliations to assure the accuracy of accounts";

♦ "Preparing and supplying ... periodic statements of ... account performance" and balances to account holders; and

♦ "Establishing consistent, written policies and procedures for trust fund management and accounting."

*Id.*

There is no dispute that the federal government owes IIM beneficiaries—the plaintiffs/appellees—these duties. The district court so found and the Interior Department conceded as much at trial. *See, e.g., Cobell V,* 91 F.Supp.2d at 32–33. While arguing that plaintiffs' claims should be evaluated on the basis of what is contained in the Act alone, the Interior Department did not dispute that these duties "must be interpreted in light of the common law of trusts and the United States' Indian policy." *Id.* at 33. Most significantly, the Interior Department stipulated that many of the duties owed under the 1994 Act were not being fulfilled. *See id.* (listing Interior Department stipulations). In other words, the federal government readily acknowledges that it is in breach of at least some of the fiduciary duties owed to IIM beneficiaries.

## The Office of the Special Trustee & the High Level Implementation Plan

The 1994 Act created the Office of the Special Trustee for American Indians ("OST") "to provide for more effective management of, and accountability for the proper discharge of, the Secretary's trust responsibilities" and ensure proper reform measures are implemented. 25 U.S.C. § 4042(b)(1). The Special Trustee ("ST") is a sub-cabinet level officer appointed by

---

2. That the law recognized, rather than created, the government's IIM trust duties is clear from the Act's text and structure. Indeed, Title I of the Act is titled "Recognition of Trust Responsibility."

the President and confirmed by the Senate who reports directly to the Interior Secretary. *Id.* § 4042(b). The ST is required to develop a "comprehensive strategic plan" for trust management reform and an appropriate reform timetable to ensure "proper and efficient discharge of the Secretary's trust responsibilities." *Id.* § 4043(a)(1). The ST is also to oversee a "fair and accurate accounting" of the trust accounts and submit annual reports to Congress. *Id.* § 4043(b)(2)(A) and (f). Despite these responsibilities, the ST only has "general oversight" responsibilities; decision-making authority for IIM trust management remains with the Secretary of the Interior. *Id.* § 4043(b)(1).

The first ST under the Act was Paul Homan. In April 1997, Homan submitted a "strategic plan" to the Secretary and Congress pursuant to the 1994 Act. Among other things, the plan called for the reorganization of Indian trust fund management and the centralization of record-keeping, changes that may have required legislative authorization. The Interior Secretary opted to implement portions of the strategic plan, including the upgrade of computer systems, the clean-up of trust records, and the elimination of processing backlogs. The Secretary's plan, known as the High Level Implementation Plan ("HLIP"), was issued in July 1998. As drafted, the HLIP consisted of twelve "subprojects" which focus on ensuring the accuracy of information regarding the IIM trust accounts and developing uniform policies and procedures to guide trust management in the future. These subprojects included data cleanup, clearing probate backlogs, improving records management, and establishing internal controls to prevent future mismanagement.

The HLIP is designed to overcome numerous gaps and deficiencies in the Interior Department's record-keeping and trust management. Those identified by the district court as "central" to this case are the following:

♦ *Data Cleanup*—The records upon which the government must rely to fulfill its trust duties are woefully deficient. In particular, the Interior Department does not have complete or accurate information on the identities or whereabouts of all trust beneficiaries, nor does the Department have complete land title records. For instance, as of 1998, there were over 46,000 IIM trust accounts without current addresses for the beneficiary and over 123,000 accounts without a Social Security or Tax Identification number. To address these concerns, the HLIP calls for the inventorying of existing documents from IIM trust offices around the country and the reconciliation of conflicting records. However, the trial court found "no written plan" to obtain "missing information" necessary for compiling complete land title records. *Cobell V*, 91 F.Supp.2d at 17.

♦ *Probate Backlog*—The Bureau of Indian Affairs has a probate backlog of approximately 12,000 cases, some or all of which could affect the payments owed to individual trust beneficiaries. There is currently "no formal plan" to address this backlog. There is, however, a "reinvention team" that is to address probate concerns and fractionated interests in land. *Id.*

♦ *Appraisal Program*—The trial court found evidence of an estimated 212,000 title defects. These defects can impact the processing of leases which can, in turn, impact the government's ability to render an accounting for the trust beneficiaries. Under the HLIP, the Interior Department plans to reduce the backlog, at least in part, "by redefining when appraisals are required as a matter of Interior policy." *Id.* at 18.

♦ *Computer Systems*—The Interior Department does not have computer systems in place capable of tracking trust resources and relevant data. The current system, known as the "legacy" system, is not capable of performing this function. The HLIP calls for the acquisition and implementation of two new computer systems to replace the legacy system: the Trust Fund Accounting System ("TFAS") and the Trust Asset and Accounting Management System ("TAAMS"). *Id.*

♦ *Records Management*—The Interior Department acknowledges that adequate record-keeping is essential if the Department is to fulfill its fiduciary obligations to the IIM trust beneficiaries. Yet, as Interior stipulated at trial, the current record-keeping system is woefully inadequate. To address this concern, the HLIP establishes a "records management group" to develop a plan for transferring financial records from BIA to OST and maintaining trust records into the future. *Id.* at 20–21.

Despite OST's substantial responsibilities, Congress did not provide for funding of OST in the 1994 Act, nor has the Interior Department sought funding for OST in its departmental budget requests sufficient to meet the ST's estimated costs. In January 1999, the Interior Secretary announced his unilateral reorganization of OST, prompting Homan's resignation.[3]

There are also trust management problems at the Treasury Department. In response to plaintiff's charges, the Treasury Department stipulated to the following problems and remedies:

♦ *Illegal Document Policies*—The Treasury Department regularly allows the destruction of documents over six years and seven months old in conformity with the National Archives and Records Administration's document destruction schedule. At present, no effort is made to ensure that IIM trust records or other documents that could be needed to conduct an adequate accounting are preserved. As a result, IIM trust records necessary for an accounting of the trust accounts have been irretrievably lost. The Treasury Department has agreed to develop a record retention schedule for trust documents for the purposes of this litigation and into the future. *Id.* at 23.

♦ *Time Lapse in Fund Availability*—There can be a time lapse between the deposit of funds with the Treasury Department and the investment of those funds by the Interior Department on behalf of IIM trust beneficiaries. The Treasury Department has agreed to facilitate investment when funds are initially deposited. *Id.* at 22.

♦ *Lost Interest on IIM Checks*—According to plaintiffs, some IIM beneficiaries lose interest during the delay between the time a check is issued and when that check can be presented for payment. Treasury has agreed to conduct a study of the alleged time lapse and resulting lost interest. *Id.* at 22–23.

The Treasury Department further stipulated to the development of new systems and procedures that could potentially fulfill the Department's fiduciary obligations. *Id.* at 22.

## D. District Court Proceedings

On June 10, 1996, appellees filed this class-action suit "to compel performance of trust obligations." They alleged that the

---

**3.** Thomas Thompson was acting ST at the time of trial. In February 2000, then-President Clinton nominated Thomas N. Slonaker for the position, who at the time of briefing was awaiting Senate confirmation.

federal government's trustee-delegates, including the Secretaries of the Interior and Treasury, breached the fiduciary duties owed to plaintiffs by mismanaging the IIM trust accounts. On February 4, 1997, the district court certified the named plaintiffs under Federal Rule of Civil Procedure 23(b)(1)(A) and (b)(2) as class representatives for all present and former IIM account beneficiaries. *Cobell v. Babbitt (Cobell I)*, 30 F.Supp.2d 24, 28 (D.D.C.1998). On May 5, 1998, the district court bifurcated the case for trial. Phase I would address "fixing the system" or reforming the management and accounting of the IIM trusts so as to meet the federal government's fiduciary responsibilities. Phase II will address historical accounting of the accounts.

On November 5, 1998, the district court rejected the government's motion to dismiss and for summary judgment. The court found that the government waived sovereign immunity pursuant to Section 702 of the Administrative Procedure Act. *Id.* at 30–35. The court also dismissed some of plaintiffs' claims for money damages and held that the government's fiduciary duties to IIM trust beneficiaries were not ministerial in nature and therefore could not be compelled by mandamus. *Id.* at 35–36.

Later in 1998, the court held Interior Secretary Bruce Babbitt, Treasury Secretary Robert Rubin, and Assistant Interior Secretary Kevin Gover in contempt of court for failing to comply with the court's production orders and imposed monetary sanctions. *See Cobell v. Babbitt ("Cobell II")*, 37 F.Supp.2d 6 (D.D.C.1999) (holding defendants in contempt of court for failing to make good faith effort to comply with discovery order); *Cobell v. Babbitt ("Cobell IV")*, 188 F.R.D. 122 (D.D.C.1999) (awarding sanctions). As trustee delegates these officials had a clear obligation to maintain trust records and furnish such records to beneficiaries upon request, yet they were unable to provide such records and related documents to the court in response to an Order of Production. *See Cobell II*, 37 F.Supp.2d at 23. The district court found that these officials had failed to make a good faith effort to produce such information. Indeed, the district court found that the defendants "proposed a stipulated order to the court and then immediately improperly instructed their field personnel on what documents were required to be produced." *Id.* at 28. The egregious nature of this conduct was only compounded by the Treasury Department's contemporaneous destruction of documents potentially responsive to the court's production order, and the failure of government officials "to apprise the court or the plaintiffs of the defendants' unwillingness and self-inflicted inability to comply" with the production orders. *Id.* at 28, 31.

On June 7, 1999, the district court denied the government's motion for summary judgment on some of the plaintiffs' claims. In addition, the court found that the federal government waived its sovereign immunity against a suit for injunctive and declaratory relief for the breach of trust duties. *See Cobell v. Babbitt ("Cobell III")*, 52 F.Supp.2d 11 (D.D.C.1999).

The court held a six-week trial on the Indians' claims, and issued its opinion on December 21, 1999. After satisfying itself that it had jurisdiction over plaintiffs' claims, the district court found that the federal government had breached some of the fiduciary duties owed to plaintiffs. Among the district court's specific conclusions were:

♦ under the 1994 Act defendants must provide IIM trust beneficiaries with "an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited," *Cobell V*, 91 F.Supp.2d at 58;

♦ under the 1994 Act defendants must "retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting" for the trust beneficiaries, *id.*;

◆ the Interior Secretary and Assistant Secretary must "establish written policies and procedures" for: a) "collecting from outside sources missing information necessary to render an accurate accounting of the IIM trust"; b) "the retention of IIM-related trust documents necessary" for an accurate accounting; c) "computer and business systems architecture necessary" for an accurate accounting; and d) "the staffing of trust management functions necessary" for an accurate accounting, *id.*;

◆ the Treasury Secretary owes IIM trust beneficiaries "the statutory trust duty to retain IIM trust documents" necessary for an accurate accounting, *id.*

The court further found that the defendants were in violation of the above-mentioned fiduciary duties, ordered them to come into compliance with their duties and remanded the required actions to the defendants for further proceedings "not inconsistent" with the court's opinion. *Id.* The court rejected plaintiffs' plea for the appointment of a special master to oversee the government's compliance with its fiduciary duties. *Id.* at 49.

The court did not rule for the plaintiffs on all counts, however. The court dismissed their pure common-law claims as well as those claims alleging obstruction of the Special Trustee. *Id.* at 28–31, 51–52. The court retained continuing jurisdiction over the case for the next five years, during which time the defendants are required to submit quarterly status reports summarizing the government's progress in meeting its fiduciary duties to the IIM trust beneficiaries. *Id.* at 58–59.

The court certified its order for interlocutory appeal under 28 U.S.C. § 1292(b) "[t]o the extent that the court's order is not 'otherwise appealable.'" *Cobell V*, 91 F.Supp.2d at 57. The defendants appealed, alleging that the district court improperly construed the nature and extent of the government's fiduciary duties to IIM trust beneficiaries. Specifically, appellants take issue with the district court's finding of specific trust obligations, including a judicially enforceable duty to account, and the district court's conclusion that trust reforms have been unlawfully withheld or unreasonably delayed. Further, appellants allege that the district court lacked sufficient basis to award equitable relief and that the relief awarded was unwarranted.

## II. Jurisdiction

### A. Subject Matter Jurisdiction

■ Although appellants have not renewed their jurisdictional challenge to plaintiffs' claims, we must assure ourselves that we have jurisdiction. Plaintiffs' claims allege breach of trust obligations grounded in federal law and plaintiffs seek enforcement of their federal rights. Plaintiffs' claims thus "arise under" the laws of the United States, granting federal court jurisdiction under 28 U.S.C. § 1331. *See, e.g., Robbins v. Reagan*, 780 F.2d 37, 43 (D.C.Cir.1985); *Association of National Advertisers, Inc. v. FTC*, 617 F.2d 611, 619 (D.C.Cir.1979).

### B. Sovereign Immunity

■ The federal government claimed sovereign immunity below, but did not renew this claim on appeal. As the court below noted, section 702 of the Administrative Procedure Act waives federal officials' sovereign immunity for actions "seeking relief other than money damages" involving a federal official's action or failure to act. 5 U.S.C. § 702. Insofar as the plaintiffs seek specific injunctive and declaratory relief—and, in particular, seek the accounting to which they are entitled—the government has waived its sovereign immunity under this provision. *See Bowen v. Massachusetts*, 487 U.S. 879, 894–95, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). That plaintiffs rely upon common law trust principles in pursuit of their claim is immaterial, as here they seek specific relief other

than money damages, and federal courts have jurisdiction to hear such claims under the APA.

## C. Final Agency Action

■ Whether there is a final agency action is also a jurisdictional question. With a few exceptions, if there is no final agency action, there is no basis for review of the government's decision or policy. One exception occurs where plaintiffs claim that a governmental action was unlawfully withheld or unreasonably delayed.

When the district court rejected the government's motion to dismiss in November 1998, it held that the HLIP itself constitutes final agency action. *Cobell I*, 30 F.Supp.2d at 33. This conclusion was based on a concession made by government counsel at oral argument on the motion. *Id.* At trial, however, appellants argued that there was no final agency action for the court to review. *Cobell V*, 91 F.Supp.2d at 35–36. Appellants' new position was that the HLIP was not a final agency action because it was (and continues to be) a "work in progress." *Id.* at 36. The court rejected this argument holding that the preexisting accounting system used to administer the IIM trust constituted a final agency action capable of review. *Id.; see also Cobell I*, 30 F.Supp.2d at 33–34. It is the existing system, and not any proposed reform or replacement that "aggrieves plaintiffs today." *Cobell V*, 91 F.Supp.2d at 36.

■ Although the government does not press the issue, this conclusion by the district court is questionable. While a single step or measure is reviewable, an on-going program or policy is not, in itself, a "final agency action" under the APA. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 890, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). A plaintiff "cannot seek *wholesale* improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.* at 891, 110 S.Ct. 3177.

■ This is not to say that the district court lacked jurisdiction to hear plaintiffs' claims, however. Where a federal court has jurisdiction to hear challenges to an agency action it also has jurisdiction over claims of unreasonable delay. *See Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 75 (D.C.Cir. 1984). As this court has noted in the past, where "an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C.Cir.1987); *see also Public Citizen Health Research Group v. Commissioner*, 740 F.2d 21, 32 (D.C.Cir.1984). Were it otherwise, agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action.

In the case at bar, it is clear that the federal government has been under an obligation to discharge the fiduciary duties owed to IIM trust beneficiaries for decades. It is also clear that refusing to hear plaintiffs' claims could unduly prejudice their rights as trust beneficiaries. The district court's findings of fact, largely unchallenged by the government, make clear that insofar as the federal government owes trust beneficiaries a duty to maintain records and provide an accounting, delaying review is tantamount to denying review altogether. The district court further concluded that appellants' extensive delay in discharging their fiduciary duties was unreasonable. In such circumstances, federal courts may exercise jurisdiction to compel agency action "unlawfully withheld or unreasonably denied." 5 U.S.C. § 706.

■ Even assuming, as appellants argue, that the 1994 Act effectively reset the clock for a finding of unreasonable delay, appellants' "reasonable time to discharge" its fiduciary obligations "has expired." *Cobell V*, 91 F.Supp.2d. at 48. The district court's judgment came down over six years after passage of the 1994 Act. During

that time, deadlines were missed, documents destroyed, and, in the words of the district court, appellants had yet to progress much beyond planting the "seed" for discharging their fiduciary obligations. *See id.* at 20. Courts owe substantial deference to agency prerogatives in fulfilling their legal obligations, especially where Congress intervenes to address longstanding problems, as it did with the 1994 Act. But this does not require courts to turn a blind eye when government officials fail to discharge their duties.

 As a general rule, Section 706 of the APA "leaves in the courts the discretion to decide whether agency delay is unreasonable." *Forest Guardians v. Babbitt,* 174 F.3d 1178, 1190 (10th Cir.1999). The legal standard used to determine whether agency delay is unreasonable is a question of law to be reviewed *de novo* by this court. However, the factual findings that underlie that determination are only to be overturned if the district court's findings are clearly erroneous.

 For good reason, courts are reluctant to upset existing agency priorities, unless the delay is "egregious." *See Telecommunications Research and Action Center,* 750 F.2d at 79. An agency's own timetable for performing its duties in the absence of a statutory deadline is due "considerable deference." *Sierra Club v. Gorsuch,* 715 F.2d 653, 658 (D.C.Cir.1983). Moreover, "a finding that delay is unreasonable does not, alone, justify judicial intervention." *In re Barr Labs., Inc.,* 930 F.2d 72, 75 (D.C.Cir.1991).[4]

 In reviewing an unreasonable delay claim, this court considers four factors:

First, "the court should ascertain the length of time that has elapsed since the agency came under a duty to act".... Second, "the reasonableness of the delay must be judged 'in the context of the statute' which authorizes the agency's action."... Third, the court must examine the consequences of the agency's delay.... Finally, the court should give due consideration in the balance to "any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources."

*In re International Chemical Workers Union,* 958 F.2d 1144, 1149 (D.C.Cir.1992) (citations omitted).

 Considering the first two factors, it is beyond question that the government has delayed fulfilling its trust obligations for many years. The district court specifically found that IIM trust beneficiaries have been denied their rights—in particular their right to an accounting—for decades. *See Cobell V,* 91 F.Supp.2d at 47 (noting that IIM beneficiaries have waited "a century" for "an accurate accounting" which is the "most basic fiduciary duty"). That Congress enacted its own remedial statute to address this unconscionable delay does not mitigate the egregious amount of time plaintiffs have waited for, as discussed below, the 1994 Act is not the source of plaintiffs' rights. Rather, it is designed to help rectify the government's longstanding failure. Given the record before it, the district court reasonably concluded that absent court intervention, discharge of the government's fiduciary obligations may yet be far off.

Appellants note that the 1994 statute provides no deadlines for the reforms at issue. Failure to provide a statutory timetable may indicate that Congress sought to leave the timing of reform to agency discretion. But the lack of a timetable does not give government officials carte blanche to ignore their legal obligations. This is particularly true where, as here, the act of outlining specific steps toward reform was

---

**4.** *But see Forest Guardians,* 174 F.3d at 1191 ("once a court deems agency delay unreasonable, it must compel agency action.").

enacted against a background of agency delay dating back many years.

The district court noted that the consequences of further agency delay are potentially quite severe. Documents necessary for a proper accounting and reconciliation have been lost or destroyed, and the district court found little reason to believe that this would change in the near future. "The longer defendants delay in creating the plans necessary to render an accounting, the greater the chance that plaintiffs will never receive an actual accounting of their own trust money." *Cobell V*, 91 F.Supp.2d at 47. Given that many plaintiffs rely upon their IIM trust accounts for their financial well-being, the injury from delay could cause irreparable harm to plaintiffs' interests as IIM trust beneficiaries. Thus it seems that "the interests at stake are not merely economic interests in [an administrative scheme], but personal interests in life and health." *Public Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1156 (D.C.Cir.1983) (citation omitted).

Concern for "administrative convenience" certainly counsels against interfering with the government's reform priorities. *See Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 476 (D.C.Cir.1998) ("Although the APA gives courts the authority to 'compel agency action unlawfully withheld or unreasonably delayed,' we are acutely aware of the limits of our institutional competence in the highly technical area at issue in this case."(citations omitted)). Yet neither a lack of sufficient funds nor administrative complexity, in and of themselves, justify extensive delay, nor can the government claim that it has become subject to unreasonable expectations. Federal officials were aware of their fiduciary obligations long before the passage of the 1994 Act–let alone the initiation of this action–and yet little progress has been made in discharging those duties. What little progress the government has made appears more due to the litigation than diligence in discharging its fiduciary obligations. *See* Misplaced Trust H.R.Rep. No. 102–499, at 5 (noting that "the only thing that seems to stimulate a flurry of activity at the Bureau [of Indian Affairs] is an impending appearance ... before a congressional committee"). *See also Cobell V*, 91 F.Supp.2d at 20 n.15 (noting that the "positive steps taken by defendants toward bringing themselves into compliance with the law" have "not come easily"). For these reasons, we find no basis for disturbing the district court's conclusion that appellants unreasonably delayed the discharge of their fiduciary obligations, nor for upsetting the district court's exercise of jurisdiction under 5 U.S.C. § 706 on this basis.

### III. Discussion

Appellants contend that the district court erred in finding that the Secretary of the Interior committed "four statutory breaches of IIM trust duties ... that warrant prospective relief." *Cobell V*, 91 F.Supp.2d at 40. They challenge both the district court's conclusions that specific measures were required under the 1994 Act for the government to fulfill its fiduciary obligations and its provision of prospective equitable relief awarded. Specifically, the government argues that the 1994 Act does not require the creation of written policies and procedures covering the four areas identified by the district court.

To the extent that appellants contest the district court's conclusions defining the federal government's fiduciary obligations to IIM trust beneficiaries, they raise questions of law that we review *de novo*. Yet insofar as appellants challenge factual findings, we will uphold the district court unless its findings are clearly erroneous. Such findings include the district court's determination whether the steps taken by appellants in recent years toward fulfilling their legal obligations have been sufficient, or whether there has been unreasonable

delay in discharging the government's fiduciary duties.

Applying these standards, the government is incorrect to the extent that it assumes that the 1994 Act forms the basis for its fiduciary obligations. The 1994 Act did not create these obligations any more than it created the IIM trust accounts. As noted above, the 1994 Act was a remedial statute designed to ensure more diligent fulfillment of the government's obligations. It recognized and reaffirmed what should be beyond dispute—that the government has longstanding and substantial trust obligations to Indians, particularly to IIM trust beneficiaries, not the least of which is a duty to account. While the district court erred in characterizing some specific actions as material breaches that were themselves merely indicia of appellants' breach, there is ample evidence in the record to support the district court's broader conclusion that appellants' failure to take reasonable steps toward the discharge of their trust obligations constituted a breach of their fiduciary duties. Once this conclusion was reached, the district acted well within its power to provide modest equitable relief, requiring appellants to do little more than develop plans to ensure proper discharge of their duties within a reasonable time. The district court did not exceed its powers with this order, nor with its decision to maintain jurisdiction over the case.

### A. The Trust Relationship

There is no doubt that the federal government has a longstanding fiduciary obligation to IIM trust beneficiaries. "[T]he law is 'well established that the Government in its dealings with Indian tribal property acts in a fiduciary capacity.'" *Lincoln v. Vigil*, 508 U.S. 182, 194, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (quoting *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707, 107 S.Ct. 1487, 94 L.Ed.2d 704 (1987)). In the leading case on Indian trust responsibilities,

*United States v. Mitchell* ("*Mitchell II*"), the Supreme Court was clear:

> A fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians. All of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds).

463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (citing RESTATEMENT (SECOND) OF TRUSTS § 2, cmt. h (1959)).

This rule operates as a presumption. *See Loudner v. United States*, 108 F.3d 896, 900 (8th Cir.1997) (" '[T]here is a presumption that absent explicit language to the contrary, all funds held by the United States for Indian tribes are held in trust.'" (quoting *Rogers v. United States*, 697 F.2d 886, 890 (9th Cir.1983))). Therefore, courts correctly recognize a trust relationship even where it is not explicitly laid out by statute. Specifically, " 'where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.' " *Mitchell II*, 463 U.S. at 225, 103 S.Ct. 2961 (quoting *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 183, 624 F.2d 981 (1980)).

It is no doubt true that "the government's fiduciary responsibilities necessarily depend on the substantive laws creating those obligations." *Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C.Cir.1995); *see also Mitchell II*, 463 U.S. at 224, 103 S.Ct. 2961 (the relevant statutes and regulations "define the contours of the United States' fiduciary responsibilities."); *National Wildlife Federation v. Andrus*, 642 F.2d 589, 611 (D.C.Cir.1980) ("[A] trust responsibility

can only arise from a statute, treaty, or executive order." (citation omitted)). This does not mean that the failure to specify the precise nature of the fiduciary obligation or to enumerate the trustee's duties absolves the government of its responsibilities. It is well understood that "[t]he extent of [a trustee's] duties and powers is determined by the trust instrument and the rules of law which are applicable." RESTATEMENT (SECOND) OF TRUSTS § 201, at 442 (1959). It is the nature of any instrument that establishes a trust relationship that many of the duties and powers are implied therein. They arise from the nature of the relationship established.

While the government's obligations are rooted in and outlined by the relevant statutes and treaties, they are largely defined in traditional equitable terms. "Where Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms." *NLRB v. Amax Coal Co.*, 453 U.S. 322, 329, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981). Courts "must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary." *Id.* at 330, 101 S.Ct. 2789. Much as the Supreme Court has regularly turned to the Restatement and other authorities to construe trust responsibilities, it is appropriate for the district court to consult similar sources.

■ Despite the imposition of fiduciary duties, federal officials retain a substantial amount of discretion to order their priorities. In *Lincoln v. Vigil*, for example, the Supreme Court held that the government's fiduciary relationship with Indians "could not limit" an agency's discretion "to reorder its priorities" as among beneficiaries. 508 U.S. 182, 195, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993). In *Lincoln*, the Court rejected a challenge to the Indian Health Service's decision to discontinue a health

program for handicapped Indian children in one region of the country in order to devote greater resources to a national program. Nonetheless, the Secretary "cannot escape his role as trustee by donning the mantle of administrator" to claim that courts must defer to his expertise and delegated authority. *Jicarilla Apache Tribe v. Supron Energy Corp.*, 728 F.2d 1555, 1567 (10th Cir.1984) (Seymour, J., concurring in part and dissenting in part), *adopted as majority opinion as modified en banc*, 782 F.2d 855 (10th Cir.1986).

■ The Secretary has an "overriding duty ... to deal fairly with Indians." *Morton v. Ruiz*, 415 U.S. 199, 236, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). This duty necessarily constrains the Secretary's discretion. When faced with several policy choices, an administrator is generally allowed to select any reasonable option. Yet this is not the case when acting as a fiduciary for Indian beneficiaries as "stricter standards apply to federal agencies when administering Indian programs." *Jicarilla*, 728 F.2d at 1567. Summarizing federal case law on fiduciary obligations owed to Indian tribes, the Tenth Circuit concluded that where "the Secretary is obligated to act as a fiduciary ... his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary." *Id.* at 1563. The federal government has "charged itself with moral obligations of the highest responsibility and trust" in its relationships with Indians, and its conduct "should therefore be judged by the most exacting fiduciary standards." *Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); *cf. Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 n. 8 (D.C.Cir.1988) (giving "careful consideration to Interior's interpretation" of the Oklahoma Indian Welfare Act, but not deferring to it).

**B. The 1994 Act**

■ The crux of appellants' argument is that there was no material breach of

their fiduciary obligations as defined by the 1994 Act. Specifically, appellants contend that the district court found obligations beyond those enumerated in the Act, when Congress had intended that OST would determine the proper content and timing of policies and procedures to discharge appellants' fiduciary obligations. Therefore, insofar as this process has yet to be completed, appellants contend that there is no basis for the district court to find that appellants unlawfully withheld or unreasonably delayed discharge of their obligations.

The fundamental problem with appellants' claims is the premise that their duties are solely defined by the 1994 Act. The Indian Trust Fund Management Reform Act reaffirmed and clarified preexisting duties; it did not create them. It further sought to remedy the government's long-standing failure to discharge its trust obligations; it did not define and limit the extent of appellants' obligations. While appellants are right to quibble with some of the district court's specific findings, the premise upon which much of their appeal rests is unsustainable.

The trust nature of the federal government's IIM responsibilities was recognized long before passage of the 1994 Act. *See* FELIX S. COHEN, HANDBOOK OF FEDERAL INDIAN LAW, 630–31 (1982 ed.). As early as 1831, the Supreme Court recognized that the relationship between Indians and the federal government was like "that of a ward to his guardian." *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831) (Marshall, C.J.). Half a century later, in upholding a statute placing certain crimes between Indians under federal jurisdiction, the Court again noted that "Indian tribes *are* the wards of the nation" and reaffirmed that the federal government owes Indians a "duty of protection." *United States v. Kagama,* 118 U.S. 375, 383, 384, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). The fiduciary nature of the government's duty was made explicit in *Seminole Nation v. United States,* 316 U.S. 286, 62 S.Ct.

1049, 86 L.Ed. 1480 (1942). In *Seminole Nation* the Court applied the "most exacting fiduciary standards" of the common law in assessing the government's discharge of its duties. *Id.* at 297, 62 S.Ct. 1049. And in *Mitchell II,* the Court reiterated the existence of a "general trust relationship" which imposes "distinctive obligation[s]" in addition to those established by statute. 463 U.S. at 225, 103 S.Ct. 2961 (citation omitted).

Enactment of the Indian Trust Fund Management Reform Act in 1994 did not alter the nature or scope of the fiduciary duties owed by the government to IIM trust beneficiaries. Rather, by its very terms the 1994 Act identified a portion of the government's specific obligations and created additional means to ensure that the obligations would be carried out. Indeed, the 1994 Act explicitly reaffirmed the Interior Secretary's obligation to fulfill the "trust responsibilities of the United States." 25 U.S.C. § 1629(d). From this express language, "we must infer that Congress intended to impose on trustees traditional fiduciary duties unless Congress has unequivocally expressed an intent to the contrary." *NLRB v. Amax Coal Co.,* 453 U.S. 322, 330, 101 S.Ct. 2789, 69 L.Ed.2d 672 (1981).

■ Section 101 of the 1994 Act states that the Interior Secretary's "proper discharge of the trust responsibilities *shall include (but are not limited to)*" eight enumerated actions, 25 U.S.C. § 1629(d) (emphasis added). In other words, the government has other trust responsibilities not enumerated in the 1994 Act. *See Puerto Rico Maritime Shipping Auth. v. ICC,* 645 F.2d 1102, 1112 n. 26 (D.C.Cir. 1981) ("It is hornbook law that the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive." (citation omitted)). Moreover, applicable canons of statutory construction counsel *against* interpreting a statute creating a new remedy to eliminate prior remedies and *in favor* of construing a statute affecting Indians in a manner

favorable to Indians. *See* 2B § 50.05 SUTHERLAND, STATUTORY CONSTRUCTION, at 109 (5th ed. Norman J. Singer ed.1992); *see also Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *United States v. Santa Fe Pacific R.R. Co.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941).

Section 101 of the 1994 Act does not *create* "trust responsibilities of the United States." Rather it lists some of the means through which the Secretary shall discharge these preexisting duties. For instance, the first listed duty is "[p]roviding adequate systems for accounting for and reporting trust fund balances." 25 U.S.C. § 162a(d)(1). This would not be necessary to discharge the government's trust responsibilities were not the government *already* obliged to account for and report trust fund balances. Rather than exhaust the list of duties owed by the federal government to IIM trust beneficiaries, the 1994 Act clarified and augmented aspects of the government's preexisting obligations to facilitate their fulfillment.

This view of the federal government's fiduciary duties is supported by *Mitchell II* which held that "a fiduciary relationship necessarily arises when the government assumes such elaborate control over ... property belonging to Indians"—in particular where, as here, "[a]ll of the necessary elements of a common-law trust are present." 463 U.S. at 225, 103 S.Ct. 2961. The general "contours" of the government's obligations may be defined by statute, but the interstices must be filled in through reference to general trust law. While *Mitchell II* involved a claim for damages, nothing in that decision or other Indian cases would imply that appellants are not entitled to declaratory or injunctive relief. Such remedies are the traditional ones for violations of trust duties.

▮ Appellants imply that the district court did not show sufficient deference to their roles as administrative officials charged with developing and implementing policies and procedures to ensure the discharge of the federal government's obligations. Appellants thus imply, but do not argue, that their interpretation of the 1994 Act, and the obligations that it imposes, is due deference under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Assuming that the 1994 Act is ambiguous, this does not enable the government to escape liability by interpreting away its fiduciary obligations. While ordinarily we defer to an agency's interpretations of ambiguous statutes entrusted to it for administration, *Chevron* deference is not applicable in this case. The governing canon of construction requires that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). Therefore, even where the ambiguous statute is one entrusted to an agency, we give the agency's interpretation "careful consideration" but "we do not defer to it." *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1445 n. 8 (D.C.Cir.1988). This departure from the *Chevron* norm arises from the fact that the rule of liberally construing statutes to the benefit of the Indians arises not from ordinary exegesis, but "from principles of equitable obligations and normative rules of behavior," applicable to the trust relationship between the United States and the Native American people. *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 59 (D.C.Cir.1991); *see also County of Oneida v. Oneida Indian Nation of New York State*, 470 U.S. 226, 247–48, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985) (Court resolves ambiguity in favor of Indian claims); *Pueblo of Sandia v. Babbitt*, 231 F.3d 878, 880 (D.C.Cir. 2000). Thus, even if the statutory language did not make clear that the government's duties predate and extend beyond those enumerated in the 1994 Act, the Interior Department would retain its

fiduciary obligations to IIM trust beneficiaries.

### C. Duty to Account

 Holding that appellants' fiduciary duties predate the 1994 Act does not dispose of all their claims. Having determined the source of appellants' obligations, we must now consider what those duties entail, at least with respect to the claims at hand. Specifically, we must consider the nature and extent of the fiduciary duty to account appellants owe to IIM trust beneficiaries.

Appellants' challenge focuses on the district court's conclusion that the IIM trust beneficiaries are entitled to a complete historical accounting of their trust accounts. The government maintains that no such right is conferred by the 1994 Act. Rather, the Act delegates responsibility for determining the nature and scope of an accounting to the Interior Department. The accounting required by Section 102 of the Act is merely a prospective right and, according to appellants, "does not speak to the extent to which the Secretary must inquire into the correctness of past transactions." Reply Brief for Appellants at 17. While appellants concede that "some type of review of past transactions may indeed be necessary to accurately state opening balances," this does not mean that the plaintiffs have a judicially enforceable right to a complete historical accounting. *Id.* Even were the plaintiffs entitled to such an accounting, appellants contend that the Interior Department, and not the court, would have the authority to determine the nature and scope of the accounting.

Contrary to appellants' claims, Section 102 of the 1994 Act makes clear that the Interior Secretary owes IIM trust beneficiaries an accounting for "*all*" funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938." 25 U.S.C. § 4011(a) (emphasis added). "All funds" means *all funds,* irrespective of when they were deposited (or at least so long as they were deposited after the Act of June 24, 1938). Therefore, the 1994 Act reaffirms the government's preexisting fiduciary duty to perform a complete historical accounting of trust fund assets.

Appellants place substantial weight on the fact that Title III of the 1994 Act instructs the ST to oversee any accounting or account reconciliation conducted by Interior. Under Section 303(b)(2)(A) the ST "shall monitor the reconciliation" of trust accounts and ensure that there is "a fair and accurate accounting of all trust accounts." *Id.* § 4043(b)(2)(A). Further, Section 304 of the Act requires the Interior Secretary to report on any account reconciliation that takes place and what steps will be taken to resolve disputes over account balances. *Id.* § 4044. Section 101 of the Act, on the other hand, specifies numerous actions that must be taken by the government, but does not dictate the nature or scope of any accounting. *See id.* § 162a(d).

Yet Title III of the 1994 Act does not vindicate the government's position as these provisions merely detail the *oversight* functions of the ST, not the fiduciary responsibilities of the federal government. The language in Title III, if anything, supports plaintiffs' claims, as it requires the ST to "ensure" that BIA "provides the account holders, with a *fair and accurate accounting of all trust accounts.*" *Id.* § 4043(b)(2)(A) (emphasis added). Appellants never explain how one can give a *fair* and *accurate* accounting of *all* accounts without first reconciling the accounts, taking into account past deposits, withdrawals, and accruals. Indeed, the government's own expert acknowledged that one could not determine an accurate account balance without confirming historical account balances.

 Even were the language of the 1994 Act ambiguous, this would not redeem appellants' position, as we follow the

same rules of construction with regard to Indian trust expectations discussed above. Courts "must be guided by that 'eminently sound and vital canon' that 'statutes passed for the benefit of Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians.'" *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (citations omitted); *see also Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918) ("[s]tatutes passed for the benefit of dependent Indian tribes ... are to be liberally construed, doubtful expressions being resolved in favor of the Indians."); *Muscogee (Creek) Nation*, 851 F.2d at 1445 n. 8 (courts should consider, but not defer, to agency interpretations of statutes concerning the federal government's obligations to Indians); *Jicarilla*, 728 F.2d at 1563 ("[W]henever doubt or ambiguity exists in federal statutes or regulations, such doubt is resolved in favor of the tribes."). Again, as we noted above, the canon of liberality of construction in favor of the Indians acts with its "special strength" even where a federal agency would in other cases enjoy the implied authority to implement ambiguous statutory language supporting a competing interpretation. *Albuquerque Indian Rights*, 930 F.2d at 59; *see also Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) (noting that "the standard principles of statutory construction do not have their usual force in cases involving Indian law").

Not only does the 1994 Act plainly reaffirm the government's preexisting duty to provide an accounting to IIM trust beneficiaries, but it is plain that such an obligation inheres in the trust relationship itself. "The obligation of a trustee to provide an accounting is a fundamental principle governing the subject of trust administration." *White Mountain Apache Tribe of Arizona v. United States*, 26 Cl.Ct. 446, 448 (1992) (citing G.T. BOGERT, TRUSTS § 141, at 494 (6th ed.1987)).

The 1994 Act requires that the Interior Department perform an "adequate" accounting. This indicates that the accounting must be sufficient to serve the purposes for which a trust accounting is typically conducted. By this standard, the district court's conclusion that the management of a trust and rendering of an adequate accounting requires the locating and retention of records, operational computer systems, and adequate staffing was, in plaintiffs' words, "self-evident." Anything less would produce an inadequate accounting.

■ This conclusion is reinforced by basic common law trust principles. It is black-letter trust law that "[a]n accounting necessarily requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception." *Engelsmann v. Holekamp*, 402 S.W.2d 382, 391 (Mo.1966); *see also* BLACK'S LAW DICTIONARY (7th ed.1999) (defining accounting as "the report of all items of property, income, and expenses" prepared by the trustee for the beneficiary). Under traditional equitable trust principles, "[t]he trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out." *White Mountain Apache Tribe*, 26 Cl.Ct. at 449.

Appellants maintain that even if an accounting is required, the district court overstepped its bounds by defining the nature of the accounting required. This argument both misrepresents the district court's opinion and misconstrues the relevant trust law principles. The district court made clear that it was "not ruling upon what specific form of accounting, if any," is required by the 1994 Act or the government's preexisting fiduciary obligation. *Cobell V*, 91 F.Supp.2d at 40, n. 32. Rather, it noted that an accounting is, in fact, required, and that such an accounting must be "of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were

deposited." *Id.* at 58. The district court explicitly left open the choice of how the accounting would be conducted, and whether certain accounting methods, such as statistical sampling or something else, would be appropriate. Such decisions are properly left in the hands of administrative agencies.

Claiming the role of administrator, however, does not absolve the government of its enforceable obligations to the IIM trust beneficiaries. As noted above, appellants may not escape from their fiduciary obligations by appealing to their roles as administrators of a federal program. In those capacities, they are trustee delegates of the federal government who owe substantial fiduciary duties to IIM trust beneficiaries. "If the Secretary is obligated to act as a fiduciary . . . then his actions must not merely meet the minimal requirements of administrative law, but must also pass scrutiny under the more stringent standards demanded of a fiduciary." *Jicarilla,* 728 F.2d at 1563.

█ Appellants also argue that whatever right to an accounting plaintiffs may have, the district court erred insofar as it determined that such a right was judicially enforceable. The only action for an accounting that could be judicially compelled, according to the government, would be an accounting accompanying an action for money damages in the court of claims under the Tucker Act. According to appellants, *Mitchell II* provides that plaintiffs can seek monetary damages in a Tucker Act claim, but not declaratory or injunctive relief because these "prospective equitable remedies are totally inadequate." 463 U.S. at 227, 103 S.Ct. 2961. No common law claim for an accounting is cognizable, and even if it were, such a claim has been waived by the plaintiffs' failure to file a cross-appeal on that claim.

Here again, appellants misconstrue the relevant case law. We have already determined that there is federal jurisdiction to hear plaintiffs' claims insofar as the federal government has unreasonably delayed or unlawfully withheld performance of its trust duties. Federal courts have repeatedly recognized the right of Native Americans to seek relief for breaches of fiduciary obligations, including suits for monetary damages under the Tucker Act where prospective remedies would be inadequate. Indeed, this is the clear import of *Mitchell II. See* 463 U.S. at 226 n. 31, 227, 103 S.Ct. 2961. "It is fundamental that an action for accounting is an equitable claim and that courts of equity have original jurisdiction to compel an accounting." *Klamath and Modoc Tribes v. United States,* 174 Ct.Cl. 483, 487 (1966).

This position should not come as a surprise to appellants, as it has been the official position of the federal government. In 1996 (prior to the filing of the initial complaint in this case) the Interior Department's Solicitor issued an opinion that government trustees have an "affirmative duty . . . to make a full and proper accounting." Nothing in the 1994 Act, nor any other federal statute, acts to limit or alter this right.

### D. Breach

Based upon the foregoing facts and recognition of the federal government's broad fiduciary obligations to IIM trust beneficiaries, particularly a duty to render a complete and accurate historical accounting, the district court found several specific breaches on the part of appellants. Specifically, the district court found that a) appellants failed to provide plaintiffs with "an accurate accounting of all money in the IIM trust held in trust for the benefit of plaintiffs, without regard to when the funds were deposited"; b) appellants in both the Interior and Treasury Department failed to "retrieve and retain all information concerning the IIM trust that is necessary to render an accurate accounting" for the trust beneficiaries; c) the Interior Secretary and Assistant Secretary failed to "establish written policies and procedures" for collecting and retaining necessary documents and information, im-

plementing "computer and business systems architecture necessary" and ensuring sufficient "staffing of trust management functions" to fulfill such obligations. *Cobell V*, 91 F.Supp.2d at 58. As discussed separately below, the court also found that the Treasury Secretary failed to retain IIM trust documents necessary for an accurate accounting. *Id.*

Appellants do not contest the district court's factual findings; appellants have failed to do what the district court concluded they failed to do. Nor do appellants forcefully maintain that those steps which they have taken toward discharging their fiduciary obligations come anywhere close to those steps necessary to fulfill the obligation to provide an accounting. Even were these findings challenged, there is more than enough substantial evidence to support the district court's findings in this regard.

■ Appellants do object to the district court's conclusions, however. Specifically, appellants argue that the district court found specific breaches of obligations that do not exist. Save for the first breach listed—that of failing to render an accounting—appellants have a point. While there is a specific duty to provide a complete accounting, there is no specific duty to, for example, implement particular policies or retrieve information either in the 1994 Act or elsewhere. This does not vindicate appellants' position, however, for while appellants may not have breached a specific duty to perform the particular tasks identified by the district court, such as implementing a IIM trust management computer system, appellants' failure to take such steps provides ample support for the district court's ultimate conclusion that appellants have unreasonably delayed the discharge of their fiduciary obligations to IIM beneficiaries, and that there is little reason to believe that, absent court intervention, these duties will be discharged any time soon.

The government's broad duty to provide a complete historical accounting to IIM beneficiaries necessarily imposes substantial subsidiary duties on those government officials with responsibility for ensuring that an accounting can and will take place. In particular, it imposes obligations on those who administer the IIM trust lands and funds to, among other things, maintain and complete existing records, recover missing records where possible, and develop plans and procedures sufficient to ensure that all aspects of the accounting process are carried out. As the district court concluded, this may well include an obligation to develop or obtain computer software capable of tracking and reconciling fund data, hire staff sufficient to execute management duties, and implement specific plans to ensure that all reasonable efforts are made to provide the most complete and accurate historical accounting of IIM trust funds that is possible. The failure to implement a computer system is not itself the breach. Rather it is indicative of appellants' failure to discharge their fiduciary obligations in a reasonably prompt manner. It is the latter which constitutes the breach.

There are similar problems with some of the district court's other specific findings of breach. For instance, one provision in Section 101 of the 1994 Act requires "[e]stablishing consistent, written policies and procedures for trust fund management and accounting." 25 U.S.C. § 162a(d)(6). Another requires the Interior Secretary to provide "adequate staffing ... for trust fund management and accounting." *Id.* § 162a(d)(7). The district court concluded that the Department of Interior had breached a duty to have "written policies and procedures for the staffing of trust management functions." *Cobell V*, 91 F.Supp.2d at 40. This may technically overstate the case. There may not literally be a duty to have such written policies and procedures. Were there a means of ensuring discharge of appellants' fiduciary obligations absent such steps, there would be no breach. Nonetheless, though the failure to take such steps may not consti-

tute a breach, it surely provides substantial evidence that such a breach has occurred.

In sum, there are numerous provisions of the 1994 Act which appellants, by their own stipulation, are unable to meet. Most significantly, the government cannot provide an adequate accounting or reconciliation and does not provide the required reports to IIM trust beneficiaries, nor did the district court find any basis for believing that such obligations would soon be met. Thus the district court's conclusions that certain types of policies and plans would be necessary for the government to discharge its fiduciary obligations are sustainable. It is clear that the federal government will be unable to provide an adequate accounting without computer systems, staffing, and document retention policies that are adequate for the task. At the same time, defendants should be afforded sufficient discretion in determining the precise route they take, so long as this threshold is met. The actual legal breach is the failure to provide an accounting, not its failure to take the discrete individual steps that would facilitate an accounting. Thus, while the district court must amend its opinion on remand to account for this distinction, there is no need to alter the district court's order, as the bottom line is the same: By failing to take reasonable steps toward the discharge of the federal government's fiduciary obligations to IIM trust beneficiaries, appellants breached their duties.

### E. The Treasury Department

Appellants specifically object to the district court's decision to award relief against the Treasury Department. Treasury stipulated it would take actions to preserve trust-related documents, which the district court acknowledged might "satisfactorily discharge" the Department's duties. *Cobell V*, 91 F.Supp.2d at

51. Moreover, appellants argue, there is no proof that the documents destroyed by the Treasury Department included anything "necessary" to render an accounting of the IIM trust accounts. At a more fundamental level, the government challenges the court's finding of any breach by the Treasury Department for failing to retain trust-related documents. While the 1994 Act does impose obligations upon the Treasury Department, there are no enumerated document retention obligations in the Act. Congress gave no indication that the government's trust responsibilities required it to alter the record destruction schedules set for the Treasury Department by the National Archives and Records Administration ("NARA").

Appellants have stipulated that the federal government is the IIM beneficiaries' trustee and that the Treasury Secretary is a trustee-delegate. A trustee is required to preserve those documents necessary to fulfill the trustee's obligations to trust beneficiaries. This includes maintaining those documents that are necessary for an accounting. Therefore, insofar as the Treasury Department has records and documents that are necessary to perform an adequate accounting, the district court was correct in holding that the Department must maintain these records. The Treasury Department's failure to maintain such documents is a breach of its fiduciary duty. The destruction of potentially relevant IIM-related trust documents that may have been necessary for a complete accounting is clear evidence that the Department committed such a breach. *See id.* at 50 n. 35 (citing Pls. Ex. 152, Treasury Declarations Re: Document Destruction, June 18, 1999).[5] As noted above, in the context of Indian trust obligations "the Government, in both its executive and legislative branches, is held to a high standard of conduct, one consonant with its 'moral obligations of the highest obligation

---

**5.** The Special Master's Report released after trial, but prior to the court's decision, detailed additional cases in which Treasury failed to

safeguard documents potentially necessary for an accounting.

and trust.' " *Jicarilla,* 728 F.2d at 1563 (quoting *Seminole Nation v. United States,* 316 U.S. at 297, 62 S.Ct. 1049).

Although the NARA guidelines direct the Treasury Department to destroy check records more than six years and seven months old, this cannot excuse the Treasury Department from its fiduciary obligations under the 1994 Act. Another agency's development, in consultation with the Treasury Department, of document retention regulations which allow for the destruction of trust-related documents cannot relieve the Treasury Department of its responsibilities. Not only are NARA's record retention schedules modified regularly to account to each agency's particular needs at a given point in time, but NARA typically approves the record retention schedule proposed by the agency. Thus, there is no basis for Treasury to contend that it was unable to maintain the records under federal rules.

F. Relief

▬ Upon concluding that appellants committed several substantial breaches of their fiduciary obligations to IIM beneficiaries, the district court issued an order to compel those actions which had been unlawfully withheld or unreasonably delayed. Specifically, the district court remanded the required actions to appellants so that they may begin to discharge the duties found by the court. Furthermore, the court retained jurisdiction over the matter in order to "ensure that defendants are diligently taking steps to rectify the continuing breaches of trust." *Cobell V,* 91 F.Supp.2d at 58. Finally, the court ordered that appellants prepare a revised HLIP and file "quarterly status reports setting forth and explaining the steps that defendants have taken to rectify the breaches of trust declared by the court." *Id.* at 59.

▬ There is no question that appellants have made significant steps toward the discharge of the federal government's fiduciary obligations. *See, e.g., id.* at 18

(noting acquisition of Trust Fund Accounting System (TFAS) software); *id.* at 20 & n. 15 (noting development of high-level records management plan). The district court, however, as the finder of fact, heard substantial evidence that these efforts were, at best, a day late and a dollar short. Thus, while appellants acquired new computer systems to track trust resources, inadequate efforts were made to ensure that the data entered into the new systems would be accurate. *See id.* at 18–19, 48–49. The district court reasonably concluded that appellants had unreasonably delayed the discharge of these duties by failing to ensure the provision of a complete historical accounting. As explained in detail above, this court is duly deferential to the burdens under which administrative agencies must operate, and recognizes that courts should not disrupt their timetables and priorities lightly. Nonetheless, there is ample evidence that appellants unreasonably delayed their actions to the detriment of IIM beneficiaries, to whom appellants owe the highest fiduciary obligations.

Appellants maintain that there is no basis in law for the district court to provide the relief granted in its decision, even if legal violations of appellants' fiduciary obligations occurred. Specifically, insofar as plaintiffs sought relief under the APA, the district court exceeded its power by ordering the Interior and Treasury Departments to take the specific actions toward fulfilling their fiduciary obligations. Moreover, insofar as the court's injunctive commands resemble mandamus, they are precluded given the lack of a "clear, ministerial duty" that could be enforced in such a fashion. Appellants' arguments are unavailing.

Federal courts have repeatedly recognized the right of Native Americans to seek relief for breaches of fiduciary obligations, including suits for monetary damages under the Tucker Act where prospective remedies would be inadequate. *See United States v. Mitchell* ("*Mitchell II*"),

463 U.S. 206, 226 n. 31, 227, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). "It is fundamental that an action for accounting is an equitable claim and that courts of equity have original jurisdiction to compel an accounting." *Klamath and Modoc Tribes v. United States,* 174 Ct.Cl. 483, 487 (1966).[6]

In *Mitchell II,* the Supreme Court (and the federal government) simply assumed that Indian beneficiaries could pursue equitable relief against the government for its breach of fiduciary duties. At issue was whether beneficiaries could seek monetary damages *where injunctive or declaratory relief would be insufficient. Mitchell II,* 463 U.S. at 227, 103 S.Ct. 2961. Indeed, the district court only considered such relief. Therefore, there is no basis for concluding that plaintiffs are somehow precluded from seeking an historical accounting, provided that they can overcome the relevant jurisdictional requirements discussed below.

■ More importantly, the district court acted well within its broad equitable powers in ordering specific relief. "[I]f a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order *any appropriate relief." Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 69, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (emphasis added). As this court has concluded in other contexts, "courts are presumed to possess the full range of remedial powers—legal as well as equitable—unless Congress has expressly restricted their exercise." *Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735, 749 (D.C.Cir.1995). This means that the district court has substantial ability to order that relief which is necessary to cure the appellants' legal transgressions:

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexi-

bility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

*Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 88 L.Ed. 754 (1944); *see also Brown v. Board of Education ("Brown II"),* 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." (footnote omitted)).

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Because the agencies involved delayed performance of their legal obligations, the court was justified in fashioning equitable relief that would ensure the vindication of plaintiffs' rights. That this case involves decades-old Indian trust funds rather than segregated schools does not change the nature of the court's remedial powers.

■ One factor the district court cites in support of its ordered relief is the government's "historical record of recalcitrance" in performing its trust duties. *Cobell V,* 91 F.Supp.2d at 54. Additionally, the APA confers authority on the court to order agency action that has been unlawfully withheld or unreasonably delayed. At the same time, the court properly notes that it "cannot 'become ... enmeshed in the minutiae' of agency administration." *Id.* (quoting *Bell v. Wolfish,* 441 U.S. 520, 562, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). It is proper for a court to allow the gov-

---

6. This is distinct from the question whether the district court can itself perform the re-

quired accounting, as we discuss below.

ernment "the opportunity to cure the breaches of trust declared" by the court. *Id.*

■ The federal government characterizes the ordered relief—the promulgation of regular reports and updates to the court while it retains jurisdiction—as excessive interference in the federal government's administration of the IIM trust. Because there are no clear, specific "ministerial" duties, the government contends, there should not be mandatory injunctive relief akin to that provided in a writ of mandamus. These are sound legal principles. However, the district court's ordered relief is relatively modest. The government must develop written policies and procedures, but the court does not tell the government what these procedures must entail. This seems consonant with the judicial policy of granting agencies that have acted in an unlawful manner "discretion to determine in the first instance," how to bring themselves into compliance. *Global Van Lines, Inc. v. ICC,* 804 F.2d 1293, 1305 n. 95 (D.C.Cir.1986). As the district court noted, in such cases "the proper course is to remand the case for further agency consideration in harmony with the court's holding." *Cobell V,* 91 F.Supp.2d at 54–55 n. 36 (citation omitted).

The level of oversight proposed by the district court may well be in excess of that countenanced in the typical delay case, but so too is the magnitude of government malfeasance and potential prejudice to the plaintiffs' class. Given the history of destruction of documents and loss of information necessary to conduct an historical accounting, the failure of the government to act could place anything approaching an adequate accounting beyond plaintiffs' reach. This fact, combined with the long-standing inability or unwillingness of government officials to discharge their fiduciary obligations, excuse court oversight that might be excessive in an ordinary case.

The government is correct that the court imposed continual reporting requirements that may be in excess of that which would be minimally required to discharge the government's duties. However, it does not seem that the district court's remedies are disproportionate to the nature of the government's breach. Moreover, while the court should (and did) remand to the agency for the proper discharge of its obligations, the court should not abdicate its responsibility to ensure that its instructions are followed. This would seem particularly appropriate where, as here, there is a record of agency recalcitrance and resistance to the fulfillment of its legal duties. *See In re Center for Auto Safety,* 793 F.2d 1346, 1354 (D.C.Cir.1986). While a court's retaining of jurisdiction of five years may be unusual, federal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations, and have the authority to compel regular progress reports in the meantime. *See, e.g., In re United Mine Workers of Amer. Int'l Union,* 190 F.3d 545, 546 (D.C.Cir.1999) (retaining jurisdiction and requiring status reports pending completion of agency action); *Northern States Power Co. v. U.S. Dep't of Energy,* 128 F.3d 754, 760 (D.C.Cir.1997) (retaining jurisdiction pending agency's compliance with court's mandate); *Air Line Pilots Ass'n, Int'l v. CAB,* 750 F.2d 81, 88–89 (D.C.Cir. 1984) (retaining jurisdiction and ordering periodic progress reports). Of course, nothing prohibits the appellants from moving for reconsideration should they be able to demonstrate at some time in the future that adequate compliance has been achieved.

## G. Future Proceedings

This case is on appeal from the first of two trial phases. In its initial scheduling order of May, 5, 1998, the district court announced its intention to hold a second phase of the trial for the purpose of "correcting the accounts." In its opinion, the district court explained what this entails: "In general terms, [the second phase] will involve the government bringing forward its proof on IIM trust balances and then

plaintiffs making exceptions to that proof." *Cobell V,* 91 F.Supp.2d at 31. The district court also identified "significant legal issues" to be resolved in the second phase, such as whether relevant statutes of limitations preclude some of plaintiffs' claims, the use of statistical sampling, and the precise scope of the certified class. *Id.* at 31 n. 22. Presumably, the district court plans to wait until a proper accounting can be performed, at which point it will assess appellants' compliance with their fiduciary obligations.

Although appellants object to the second phase of the trial, they do so largely on the grounds that IIM beneficiaries have no judicially enforceable right to an accounting at all—a claim with which we dispose above. Until the district court has undertaken the second phase of the trial, and specific objections to its actions or jurisdiction are brought, it is premature for this court to rule on the precise scope of the district court's planned proceedings. Nonetheless, we expect the district court to be mindful of the limits of its jurisdiction. It remains to be seen whether in preparing to do an accounting the Department takes steps so defective that they would necessarily delay rather than accelerate the ultimate provision of an adequate accounting, and the detection of such steps would fit within the court's jurisdiction to monitor the Department's remedying of the delay; beyond that, supervision of the Department's conduct in preparing an accounting may well be beyond the district court's jurisdiction. Again, however, until these proceedings have begun, and specific objections are brought, these are questions we cannot address.

### IV. Conclusion

The Interior Department has failed to discharge the fiduciary duties it owes to IIM beneficiaries for decades. Despite passage of the 1994 Act, the Department is still unable to execute the most fundamental of trust duties—an accurate accounting. While the district court may have mischar-

acterized some of the government's specific obligations, its broader conclusion that government officials breached their obligations to IIM beneficiaries is in accordance with the law and well-supported by the evidentiary record. Therefore, we affirm the order of the district court and remand the case to that court for further proceedings.