# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 16, 2005          Decided November 15, 2005

No. 05-5068

ELOUISE PEPION COBELL, ET AL.,
APPELLEES

v.

GALE A. NORTON,
SECRETARY, DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 96cv01285)

Mark B. Stern, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were Peter D. Keisler, Assistant Attorney General, Kenneth L. Wainstein, U.S. Attorney, Gregory G. Katsas, Deputy Assistant Attorney General, Robert E. Kopp, Thomas M. Bondy, Alisa B. Klein, Mark R. Freeman, and I. Glenn Cohen, Attorneys.

G. William Austin III argued the cause for appellees. With him on the brief were Dennis M. Gingold, Elliott H. Levitas, Mark I. Levy, and Keith M. Harper.

Before: GARLAND, *Circuit Judge*, and SILBERMAN and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  In 1994 Congress passed legislation that acknowledged the fiduciary duties that the Secretaries of the Departments of the Interior and Treasury—the defendants in this case—owed to beneficiaries of Individual Indian Money ("IIM") accounts.  Frustrated by delay in the fulfillment of these duties, plaintiffs filed a class action in 1996 on behalf of present and past beneficiaries of the accounts.  Since that time, the district court has drawn on a range of its powers in an effort to ensure that defendants live up to their duties as the accounts' trustees.  One such duty required defendants to complete a historical accounting of all trust fund assets.  This past February, the district court reissued an injunction that set out, in great detail, the means by which they were to fulfill this duty.  The defendants argue that reissuance of the injunction was an abuse of discretion.  Even the plaintiffs agree that the injunction should not stand because they believe it to be impossible to perform.  In short, neither party thinks that the injunction should survive in its present form.  We agree.

\* \* \*

The trust relationship at issue here dates back to the passage of the General Allotment Act of 1887, ch. 119, 24 Stat. 388.  The Act allotted land to individual Indians and provided that the government would "hold the land thus allotted, for the period of twenty-five years [subject to discretionary extension by the President], in trust for the sole use and benefit of the Indian to whom such allotment shall have been made." *Id*.  Whenever the government authorized money-producing transactions, such as leasing allotted lands or selling timber rights, it was supposed to

hold the revenue in individual accounts for the Indian owners of the beneficial interests in the lands. See *Cobell v. Norton*, 392 F.3d 461 (D.C. Cir. 2004) ("*Cobell XIII*"); *Cobell v. Norton*, 240 F.3d 1081, 1087 (D.C. Cir. 2001) ("*Cobell VI*"). Legislation passed in 1934 halted the process of allotting additional land but indefinitely extended the trust period for the lands that had already been allotted. Indian Reorganization Act of 1934, 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 et seq.). A separate statute enacted in 1938 authorized the Secretary of the Interior to transfer trust funds from the United States Treasury to banks or to invest them in government (or government-guaranteed) securities. An Act to Authorize the Deposit and Investment of Indian Funds, 52 Stat. 1037 (codified as amended at 25 U.S.C. § 162a). The Department of the Interior estimates that approximately $13 billion has flowed into IIM accounts since 1887, and about $12.6 billion has been distributed from them, leaving an overall balance of $416.2 million as of December 31, 2000. Declaration of James E. Cason, Associate Deputy Secretary, U.S. Department of the Interior, in Support of Motion for Emergency Stay Pending Appeal, at 3 (filed Mar. 9, 2005) ("March 2005 Cason Declaration").

The legislative enactments that initially made the federal government a trustee and then extended the trusteeship said little as to how the government was to fulfill its fiduciary obligations except to indicate the range of permissible investments. But it is not disputed that the government failed to be a diligent trustee. In the two decades leading up to plaintiffs' initiation of their lawsuit, report after report excoriated the government's management of the IIM trust funds. See *Cobell VI*, 240 F.3d at 1089 (describing reports by the General Accounting Office, the Interior Department Inspector General, and the Office of Management and Budget, among others). Embarrassed by this record, Congress in 1994 passed legislation reaffirming the government's obligation to "account for the daily and annual

balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the [1938 Act to Authorize the Deposit and Investment of Indian Funds]." American Indian Trust Fund Management Reform Act of 1994, Pub. L. No. 103-412 § 102, 108 Stat. 4239 (codified as amended at 25 U.S.C. § 161a-162a & § 4001 et seq.) ("1994 Act").

Addressing plaintiffs' claim under the Administrative Procedure Act, 5 U.S.C. §§ 702 & 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201, the district court found that the defendants had unlawfully delayed the congressionally mandated accounting and remanded the case to the defendants with instructions to bring themselves into compliance with their trust duties. *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 45-48, 57-59 (D.D.C. 1999). We affirmed the district court's order. *Cobell VI*, 240 F.3d at 1106.

Following our affirmance and a 29-day trial, the district court issued an opinion holding Interior Secretary Gale Norton and Assistant Secretary of Interior for Indian Affairs Neal McCaleb in contempt of court. *Cobell v. Norton*, 226 F. Supp. 2d 1, 161 (D.D.C. 2002). On appeal from the contempt citations, we overturned each of the five separate specifications articulated by the district court for charging the individuals with contempt. *Cobell v. Norton*, 334 F.3d 1128, 1147-50 (D.C. Cir. 2003) ("*Cobell VIII*").

In spite of our decision reversing the district court's contempt citations, the court made clear that it considered its findings of facts undisturbed. *Cobell v. Norton*, 283 F. Supp. 2d 66, 85 (D.D.C. 2003) ("*Cobell X*"). Without making any additional findings of fact on the need for broader injunctive relief, it initiated another bench trial to evaluate the parties' competing plans for bringing the defendants into compliance

with their fiduciary obligations. See *id*. At the trial's conclusion the court issued a comprehensive and detailed injunction specifying how the defendants were to go about the accounting. See *id*. at 287-95.

The district court's injunction expanded the scope of the accounting well beyond that of the plan submitted by the defendants. Among other differences, the injunction required coverage of the accounts of deceased beneficiaries and accounting for transactions prior to 1938, and it completely precluded the use of statistical sampling. The defendants had proposed to use such sampling for verification of the accuracy of the transactions underlying entries for individual accounts. In an exhibit attached to their motion to stay the injunction pending appeal, the defendants estimated that the ultimate cost of complying with the injunction would range from $6-$14 billion, as opposed to the $335 million estimated cost of the defendants' plan. Declaration of James E. Cason, Associate Deputy Secretary, U.S. Department of the Interior, in Support of Motion for Stay Pending Appeal, at 3-5 (filed Nov. 10, 2003) ("November 2003 Cason Declaration"). A more recent submission identified Interior's current best estimate as $12-$13 billion. March 2005 Cason Declaration, at 1.

On appeal, defendants raised a number of specific objections to the injunction, as well as a challenge based on a fiscal year 2004 appropriations bill passed in November 2003. The bill stated that "nothing in the [1994 Act], or in any other statute, and no principle of common law, shall be construed to require the Department of the Interior to commence or continue historical accounting activities with respect to the Individual Indian Money Trust" until either Congress passed legislation amending the 1994 Act to delineate the defendants' specific historical accounting obligations or the date December 31, 2004, had passed. Pub. L. No. 108-108, 117 Stat. 1241 (2003). We

did not reach any of the specific objections because this last challenge trumped the others; we held that by enacting that provision, Congress provided Interior temporary relief and bought itself some time to come up with a legislative solution. *Cobell XIII*, 392 F.3d at 465-66. As it turned out, Congress passed no amending legislation before its self-imposed deadline. On December 8, 2004, however, the President signed into law an appropriations bill that limited the funds available for historical-accounting purposes in fiscal year 2005 to $58 million. Pub. L. No. 108-447, 118 Stat. 2809 (2004).

The district court, and not any of the parties to this litigation, made the next move. On February 23, 2005, without holding a hearing and without making any modifications to the prior injunction's content, the district court reissued its historical-accounting injunction:

> Of course, December 31, 2004 has come and gone, and no legislative solution to the issues in this litigation is available or in the offing. Therefore, the Court is bound, by its findings of fact and conclusions of law set forth in its September 25, 2003 Memorandum Opinion, to reissue without modification the "historical accounting" provisions of its structural injunction.

*Cobell v. Norton*, 357 F. Supp. 2d 298, 300 (D.D.C. 2005) (citation omitted) ("*Cobell XIV*").

* * *

We review the district court's reissuance of the injunction for abuse of discretion and its underlying legal conclusions *de novo*. *Katz v. Georgetown University*, 246 F.3d 685, 688 (D.C. Cir. 2001). In *Cobell XIII* we explained that any injunction

issued by the district court must be grounded not only in (1) "the defendants' statutory trust duties," but also in (2) "specific findings that Interior breached those duties." 392 F.3d at 465. We examine first the consistency of the district court's injunction with these two requirements, and then turn to the particular circumstances under which the district court reissued its injunction.

The most relevant statute for ascertaining the defendants' duty to provide a historical accounting is the 1994 Act, which requires the Secretary of Interior to

> account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938.

1994 Act § 102(a), 25 U.S.C. § 4011(a). While the statute clearly reaffirms the requirement that the Secretary complete an accounting, its text offers little help in defining the accounting's scope.

In the ordinary APA case Interior would clearly enjoy a high degree of deference to its interpretation of the 1994 Act, including its ideas on the appropriate trade-off between absolute accuracy and cost (in time and money). See, *e.g.*, *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782-83 (1984). The Department embodied its interpretation in the plan that it submitted to the district court for fulfilling its fiduciary duties. See *Cobell X*, 283 F. Supp. 2d at 147-52.

Although plaintiffs' core claim is under the APA, *Cobell VI*, 240 F.3d at 1095, this is not an ordinary APA case. In *Cobell*

*XIII* we explained that the availability of common law trust precepts complicates the application of conventional deference principles to Interior's interpretations of the 1994 Act's historical-accounting provision. 392 F.3d at 473. But because the IIM trust differs from ordinary private trusts along a number of dimensions, the common law of trusts doesn't offer a clear path for resolving statutory ambiguities. Where a trustee has by misconduct or negligence made a proper accounting more difficult, the trustee may be charged for the accounting's cost, and no precept of common law constrains the cost of such an accounting, see GEORGE GLEASON BOGERT & GEORGE TAYLOR BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 963, at 459 n.36 (rev. 2d ed. 1983) (citing *Haas v. Wishmier's Estate*, 190 N.E. 548 (Ind. App. 1934)), though obviously bargaining between trustee and beneficiaries might eliminate some excesses. Absent such misconduct or negligence, however, the costs of an accounting would fall on the trust estate itself, which, as we said before, would automatically give private beneficiaries an incentive not to urge extravagance. *Cobell XIII*, 392 F.3d at 473. While Congress in the 1994 Act plainly faulted the United States' management, see, *e.g.*, H.R. REP. NO. 103-778, at 9-11 (1994), the Act's general language doesn't support the inherently implausible inference that it intended to order the best imaginable accounting without regard to cost. Even plaintiffs' counsel, responding during oral argument to a hypothetical involving $1 million in accounting expenses for a $1,000 trust, conceded some role for practicality. Oral Arg. Tr. at 63-64. Nor does the Act have language in any way appearing to grant courts the same discretion that an equity court would enjoy in dealing with a negligent trustee. Congress was, after all, mandating an activity to be funded entirely at the taxpayers' expense.

Congress's post-1994 appropriations fall equally short of supporting a mandate to indulge in cost-unlimited

accounting—in fact, they suggest quite the opposite. Our analysis in *Cobell XIII* of the fiscal year 2004 appropriations bill, Pub. L. No. 108-108, 117 Stat. 1241 (2003), quoted one Senator's conclusion that completing the judicially ordered accounting would be "nuts." 392 F.3d at 466. More importantly, Congress later limited Interior's annual expenditures for historical accounting to $58 million for two years in a row. See Pub. L. No. 108-447, 118 Stat. 2809 (2004) (appropriating funds for fiscal year 2005 for the operation of trust programs for Indians, "of which not to exceed $58,000,000 shall be available for historical accounting"); Pub. L. No. 109-54, 119 Stat. 499 (2005) (appropriating such funds for fiscal year 2006, "of which not to exceed $58,000,000 from this or any other Act, shall be available for historical accounting").

The significance of appropriations bills is of course limited and the associated legislative history even more so. First, by their own terms such bills are controlling only for a limited period except to the extent that they explicitly provide otherwise. Second, post-enactment legislative history is not only oxymoronic but inherently entitled to little weight. See *United States ex rel. Long v. SBC Business & Technical Institute, Inc.*, 173 F.3d 870, 878-79 (D.C. Cir. 1999). Nonetheless, the appropriations can't be completely disregarded.[1] They unequivocally control what may be spent on

---

[1] Plaintiffs erroneously cite *Cherokee Nation of Oklahoma v. Leavitt*, 125 S. Ct. 1172 (2005), for the proposition that "Congress's failure to appropriate sufficient funds does not relieve government of its obligations." Br. for Appellees 17 n.21. *Cherokee Nation* concerned government contracts with Indian tribes under the Indian Self-Determination and Education Act. The Court ruled that the government was legally bound to honor those contracts where Congress had, without any relevant statutory restriction, appropriated amounts ample to cover the government's contractual obligations.

historical-accounting activities during the period of their applicability. If the appropriations pattern should continue and the government's current $12-$13 billion estimate proves correct, an accounting of the sort ordered by the district court would not be finished for about two hundred years, generations beyond the lifetimes of all now living beneficiaries. Plaintiffs themselves recognize an impact from the appropriations, if only indirectly, by arguing that the defendants' "recognition" of the inadequacy of the annual appropriations "further demonstrates that the historical-accounting provisions of the structural injunction are impossible of compliance." Plaintiffs' 28(j) Letter, Sept. 7, 2005.

Thus neither congressional language nor common law trust principles (once translated to this context) establish a definitive balance between exactitude and cost. This being so, the district court owed substantial deference to Interior's plan. The choices at issue required both subject-matter expertise and judgment about the allocation of scarce resources, classic reasons for deference to administrators. See, *e.g.*, *Heckler v. Chaney*, 470 U.S. 821, 831-32, 105 S. Ct. 1649, 1655-56 (1985); *Steel Manufacturers Ass'n v. EPA*, 27 F.3d 642, 648 (D.C. Cir. 1994); *Methodist Hospital v. Shalala*, 38 F.3d 1225, 1230, 1233 (D.C. Cir. 1994). Here the district court invoked the common law of trusts and quite bluntly treated the character of the accounting as its domain. It thus erroneously displaced Interior as the actor with primary responsibility for "work[ing] out compliance with the broad statutory mandate." *Norton v. Southern Utah Wilderness Alliance*, 124 S. Ct. 2373, 2381 (2004).

We now turn to the second requirement articulated in *Cobell XIII*—that the injunction be grounded in specific findings that Interior breached its statutory trust duties. As noted earlier, the district court explicitly relied on its earlier contempt findings to justify a remedy more intensive than its initial remand to the

defendants, see *Cobell X*, 283 F. Supp. 2d at 85, even though this court had in the meantime ruled that the record was inadequate to support the contempt citations. Our decision reversing the contempt citations rested in part on the timing of the misconduct found by the district court—it occurred prior to either McCaleb's or Norton's assumption of responsibility. This point of course does not exonerate the Department of the Interior as an institution. But we also relied on the court's disregard of Interior's affirmative accomplishments on Norton's watch, *Cobell VIII*, 334 F.3d at 1148, and on the apparently uncontradicted truth of certain statements Norton made regarding efforts to improve computer security (which the district court had mistakenly thought contradicted), *id.* at 1149-50. Thus a return to the record was plainly in order before the court could rely *carte blanche* on the factual findings underlying its contempt citations.

Further, even if the prior findings had been fully valid and had supported issuance of the injunction in September 2003, they would not necessarily have supported its reissuance 17 months later in February 2005. During that 17-month period defendants continued to submit status reports to the district court documenting their progress in completing the historical accounting and otherwise fulfilling their fiduciary duties. See, *e.g.*, Department of the Interior, Status Report to the Court Number Twenty-One, Docket No. 2950 (filed May 2, 2005). For the district court to rely on the old record in the face of our previous decision and of subsequent developments was error.

Thus reissuance of the injunction was not properly grounded in either fact or law. In a sense these deficiencies aren't surprising in light of the circumstances. Because the district court reissued the injunction *sua sponte* without holding a hearing or even soliciting briefs from the parties, it failed to recognize that no party favored the injunction as now written.

What is more, the district court completely disregarded relevant information about the costs of its injunction. While the district court was unaware of just how much compliance would cost when it initially issued the injunction in September 2003, less than two months later the government submitted a cost estimate running between $6 billion and $14 billion. November 2003 Cason Declaration, at 5. Moreover, this court's opinion in *Cobell XIII* quoted the congressional conference committee report that estimated the cost of compliance at somewhere between $6 billion and $12 billion. 392 F.3d at 466. Most recently, the government stated its best estimate as $12-$13 billion. March 2005 Cason Declaration, at 1. With the benefit of a hearing or at least briefing, the district court could have learned more about the sources and validity of these estimates and used the results to guide it in any contemplated supersession of Interior's judgment.

To recap: the district court reissued an injunction dictating how Interior must fulfill its obligation to complete an accounting for the IIM trust fund in the absence of any pending request for reissuance by any party and on the ill-founded assumption that the 1994 Act gave it the freedom of a private-law chancellor to exercise its discretion. Instead of deferring to Interior's judgment about how best to execute the historical accounting, the district court set out, in great detail, how Interior must go about the job. The resulting modifications of Interior's plan evidently caused the cost of complying with the injunction to rise by more than an order of magnitude, from $335 million over five years to more than $10 billion. Under these circumstances, the district court abused its discretion by reissuing the injunction. We reach this conclusion without prejudice to plaintiffs' argument on appeal that execution of the reissued injunction is impossible, and, of course, without prejudice to future claims, such as beneficiaries' challenges to the correctness of specific account balances.

* * *

Although it is unnecessary at this stage to review all of the defendants' specific objections to the injunction, which if to be reissued at all will require drastic modification, one central point, the provision barring statistical sampling, see *Cobell XIV*, 357 F. Supp. 2d at 304, deserves mention.

As the district court pointed out, "a proper accounting does not consist merely of a list of transactions; rather, the trustee must provide supporting documentation that is adequate to demonstrate that each listed transaction actually took place." *Cobell X*, 283 F. Supp. 2d at 183-84. This step is labeled "verification"; its purpose is to correct errors that may have arisen when transactions, such as receipts of lease rentals, were posted to individual accounts. Interior proposed to verify all transactions with stated values above $5,000. For transactions valued at less than $5,000 in the "land-based" accounts,[2] Interior proposed to match only a statistically representative sample of transactions to their supporting documentation. See Department of the Interior, Historical Accounting Plan for Individual Indian Money Accounts, Docket No. 1705 (filed Jan. 6, 2003) ("Interior Plan"); *Cobell X*, 283 F. Supp. 2d at 149-50, 187. For the initial testing the plan was to study about 10% of the roughly 800,000 transactions with values between $500 and $5,000 and about 0.3% of the roughly 25 million transactions under $500. Interior Plan, at III-12. Interior's plan was to proceed in this

---

[2] The "land-based" accounts hold revenue from land allotted between 1887 and 1934. Interior would not use sampling to verify transactions in the remaining types, which include special-deposit accounts (those holding funds that could not be immediately credited to the proper owner), judgment accounts (those holding funds from tribal distributions of litigation settlements), and per capita accounts (those holding distributions from tribal revenues).

manner until it was 99% confident that statements of account reached some threshold level of accuracy (as yet not fully specified).[3] *Id*. at III-12 to 13.

In rejecting the defendants' plan to rely on statistical sampling, the district court acknowledged the extra burden in time and money but saw that singular burden as outweighed simply by the beneficiaries' preferences:

> [W]eighing against these factors [of extra monetary and time costs] is the fact that the beneficiaries themselves have overwhelmingly rejected the use of statistical sampling in the performance of Interior's historical accounting, even when confronted with the fact that such a rejection would substantially increase the time necessary to complete the accounting.

---

[3] Interior's plans were not yet fully formalized when submitted to the district court. Interior will start by hypothesizing an error rate of 1% or less; if sample results show that the true error rate is greater, it may target and correct systematic errors, revise its initial hypothesis, or select additional samples. Interior Plan, at III-12, D-2 to 3. The absence of a precise rule for testing the error rate may account for potentially conflicting statements interpreting the results of Interior's proposed analysis. Compare *id*. at III-13 (statistical analyses "will allow Interior to state, for each stratum, that it is 99 percent confident that the Historical Statements of Account are 99 percent accurate) with *id*. at D-2 (sample notice to beneficiary stating that "[w]ith 99 percent confidence, we can say that *more than* 99 percent of the transactions are accurate") (emphasis added).

Interior has also indicated that it plans to employ a set of de minimis rules in assessing accuracy, but has not yet developed them. See *id*. at III-12 n.22. These rules are significant because they will affect Interior's error rate calculations.

*Cobell X*, 283 F. Supp. 2d. at 196. The court also reasoned that "no evidence has been presented to the court that statistical sampling has ever been considered to be an appropriate method to use in conducting an accounting." See *id*. at 188 (emphasis omitted).

Under the circumstances presented here, neither beneficiaries' preferences nor the absence of precedent, nor the combination, could properly be deemed controlling. Where trade-offs are necessary because it is costly to increase accuracy, the preference of a party that will bear none of the monetary costs can't sweep the cost issue off the table. And in the situation here, where common law precedents don't map directly onto the context, the absence of precedent tells us little. Interior's decision to use statistical sampling seems especially reasonable in light of information submitted to the district court after it issued the injunction: for the subset of transactions valued at less than $500, Interior estimated that the average cost of accounting, per transaction, would exceed the average value of the transactions. November 2003 Cason Declaration, at 4.

Because the district court's ban on statistical sampling reflected no deference to defendants' expertise or to their judgment regarding the allocation of scarce resources, the district court abused its discretion by including that provision in the injunction. The other specific challenges to the injunction raised by defendants should be resolved (if necessary) by the district court under the same principles that we have applied here. In this class action under the APA the court may to a degree use the common law of trusts as a filler of gaps left by the statute, but in doing so it may not assume a fictional plaintiff class of trust beneficiaries completely and uniformly free of bars or limitations that the common law may provide.

16

* * *

Accordingly, we vacate the district court's order reissuing the historical-accounting injunction.

*So ordered*.